Approved: _____
RANDALL W. JACKSON
Assistant United States Attorney

Before:   HONORABLE RONALD L. ELLIS
          United States Magistrate Judge
          Southern District of New York

08 MAG 2325

- - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA        :   SEALED COMPLAINT

         v.                     :   Violation of
                                    21 U.S.C. § 846
MILTON SAMUELS,                 :
    a/k/a "Scooby," and             COUNTY OF OFFENSE:
LENROY MCLEAN,                  :   BRONX
    a/k/a "Dean,"
                                :
         Defendants.
                                :
- - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

        MIGUEL CARRERA, being duly sworn, deposes and says that he is a Special Agent with the United States Drug Enforcement Administration ("DEA"), and charges as follows:

COUNT ONE

        1.  From at least in or about in or about June 2007 though and including October 2008, in the Southern District of New York and elsewhere, MILTON SAMUELS, a/k/a "Scooby," and LENROY MCLEAN, a/k/a "Dean," the defendants, and others known and unknown, unlawfully, intentionally, and knowingly combined, conspired, confederated, and agreed together and with each other to violate the narcotics laws of the United States.

        2.  It was a part and object of the conspiracy that MILTON SAMUELS, a/k/a "Scooby," and LENROY MCLEAN, a/k/a "Dean," the defendants, and others known and unknown, would and did distribute, and possess with intent to distribute, a controlled substance, to wit, 5 kilograms and more of mixtures and substances containing a detectable amount of cocaine, in violation of Title 21, United States Code, Sections 812, 841(a)(1), and 841(b)(1)(A).

        (Title 21, United States Code, Section 846.)

The bases for my knowledge and the foregoing charge are, in part, as follows:

3. I have been a Special Agent with the DEA since 2004. I have conducted numerous investigations of unlawful drug distribution and importation in violation of 21 U.S.C. §§ 841(a)(1), 843(b), 846, 952, 960 and 963, and have conducted or participated in wire and physical surveillance, surveillance of undercover transactions, the introduction of undercover agents, the execution of search warrants, debriefings of informants and reviews of taped conversations and drug records. Through my training, education and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed and the methods of payment for such drugs. I have been involved personally in the investigation of this matter. I am familiar with the facts and circumstances set forth below from my personal participation in the investigation, including interviews I have conducted, my examination of reports and records, and my conversations with witnesses and other law enforcement officers. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

4. Beginning in or about March 2008, I and other federal agents received information from a cooperating witness ("CW-1"),[1] about a cocaine-trafficking organization in the New Jersey/New York area. Based on information provided by CS-1 and other evidence, the DEA obtained judicial authorization to intercept communications occurring over two telephones (the "7032 CELLPHONE" and the "6065 CELLPHONE") used by and individual named ROBERTO SANCHEZ (the "SANCHEZ Wiretap"). The investigation of ROBERTO SANCHEZ and others, including GABRIELLE COHEN-SANCHEZ and MAURICIO BURKE ("MAURICIO") ultimately led to their being arrested and indicted in this district. The DEA continued its investigation of other individuals involved in related narcotics trafficking.

---

[1] CW-1 became a cooperating witness after being apprehended in possession of a large quantity of cocaine in the Spring of 2008. Since that time, s/he has met with and been interviewed by investigating agents numerous times. CW-1 has consistently provided useful and reliable information, which has been corroborated by recorded telephone calls and other evidence.

5. In late April 2008, while wearing a recording device, CW-1 met with ROBERTO SANCHEZ, GABRIELLE COHEN-SANCHEZ, and MAURICIO, the defendants at a location in New Jersey. DEA agents surveilled the meeting from a location nearby. This meeting was monitored and recorded by investigating DEA agents. While conducting surveillance, DEA agents observed a blue Chevrolet Suburban parked in front of the meeting location, which had previously been identified as a vehicle being used by MAURICIO. CW-1 later informed investigating agents that when he arrived at the meeting location, he found ROBERTO SANCHEZ, GABRIELLE COHEN-SANCHEZ and MAURICIO waiting for him. Investigating DEA agents reviewed a recording of this conversation. The substance of the conversation proceeded as follows:

a. ROBERTO SANCHEZ and MAURICIO both stated that they were interested in obtaining CW-1's assistance in moving cocaine through the New Jersey seaport into the United States. Specifically, both ROBERTO SANCHEZ and MAURICIO stated that they would be willing to pay CW-1 $25,000 for introducing them to CW-1's contact at the port, and that they would be willing to pay additional funds to the contact.

b. ROBERTO SANCHEZ stated that this $25,000 payment would be only for the first shipment of cocaine that was to be delivered through the port with the assistance of CW-1's contact. ROBERTO SANCHEZ then said he would be willing to pay a $10,000 "down payment" to CW-1's contact, in advance of any successful shipment of cocaine. ROBERTO SANCHEZ stated that he needed access to an individual at the seaport who had the ability to track cargo containers, and could therefore provide him with constant information about the location of a container with cocaine inside of it.

c. ROBERTO SANCHEZ then said that he would like CW-1 to possibly act as a driver to move the cocaine, via truck, out of the port and into a location in New York City. CW-1 expressed concern about possibly being arrested in possession of a large amount of cocaine. MAURICIO responded by saying that if CW-1 was arrested, MAURICIO and ROBERTO SANCHEZ would easily bail CW-1 out of jail, and that CW-1 would have a highly plausible defense in that he would be "just the driver." MAURICIO stated that the authorities would be incapable of proving that CW-1 knew about any cocaine housed in a container that CW-1 would be hauling.

d. GABRIELLE COHEN-SANCHEZ directed CW-1 to "make sure" that CW-1's contact at the port was "100% on board" with the plan to import cocaine through the port. GABRIELLE

COHEN-SANCHEZ also assured CW-1 that she and ROBERTO SANCHEZ would assure that CW-1's contact at the port would be paid for her participation in the cocaine importation scheme. Finally, GABRIELLE COHEN-SANCHEZ stated that CW-1 needed to make sure that she and ROBERTO SANCHEZ got an opportunity to meet the port contact "soon."

6.  On or about June 16, 2008, agents of the Drug Enforcement Administration seized a load of approximately 225 kilograms of cocaine from a container in the New Jersey Seaport.

7.  In or about late June and July, 2008, the SANCHEZ Wiretap revealed a series of conversations between ROBERTO SANCHEZ, MAURICIO, MILTON SAMUELS, a/k/a "Scooby," the defendant, and LENROY MCLEAN, a/k/a "Dean," the defendant, among others, regarding the narcotics trafficking engaged in by the organization.  The following are examples of some of the calls intercepted over the SANCHEZ Wiretap that relate to this narcotics conspiracy:

a.  On or about June 27, 2008, at approximately 10:37 p.m., ROBERTO SANCHEZ placed an outgoing call over the 7032 CELLPHONE to MAURICIO. During this call, ROBERTO SANCHEZ asked "Listen, did the shorty call you?" MAURICIO responded "Eh . . . No, I don't believe so. I don't believe so. I haven't seen, I haven't seen any calls from him." Later in the conversation, MAURICIO stated, "I can comment to you that, being superficial, that nothing that . . .eh . . . the bets are going back and we are talking of our own sweat, no less than eight hundred dollars and from there we could see how we could distribute the dividends, but I told them that this thing is serious." ROBERTO SANCHEZ responded "Fuck man, from your lips to God's ears!" MAURICIO responded, "Sure, sure then I already put forward the program, I told them, "I want that all of them come in the same citizen, but in different units, you are going to divide the total into three and we would solve, the three of us, but its going to be done that way." ROBERTO SANCHEZ responded "Perfect, eh . . . call me to get together and talk clearly." MAURICIO then stated, "Obviously tomorrow early I will tell you what is moving because now, now more than ever there is anxiety about the right coordinates, I already told them that I only want to fuck around with William's family, of William, because David's family is coming out as very conflictive." ROBERTO SANCHEZ stated "Exact, Exactly. Eh, call the small one." MAURICIO responded, "I will do it right now, we will talk later." Based on my participation in this investigation and my review of other phone calls, I believe that when MAURICIO stated "no less than eight hundred dollars and from there we could see how we could distribute the dividends," he was referring to his belief that he and ROBERTO SANCHEZ would

-4-

receive payment in the amount of $800,000 for their work in facilitating the transport of a future shipment of cocaine. I also believe that when MAURICIO stated that he "want[ed] that all of them come in the same citizen, but in different units, you are going to divide the total into three and we would solve, the three of us, but its going to be done that way," he was referring to his plan to have the shipment sent in three separate containers. Finally, I believe that when MAURICIO stated "Obviously tomorrow early I will tell you what is moving because now, now more than ever there is anxiety about the right coordinates," he was referring to increased concern among the traffickers about their ability track the location of shipping containers concealing cocaine, due to the recent loss and eventual seizure of the 225 kilograms of cocaine.

        b.    On or about June 30, 2008, at approximately 10:32 p.m., ROBERTO SANCHEZ placed an outgoing call over the 7032 CELLPHONE to MAURICIO. During this call, MAURICIO stated that he had recently traveled to "the city of Donald Trump" and that "I came back last night and I'm a bit relaxed, with more news than a newspaper." ROBERTO SANCHEZ responded, "Good, I hope. Because listen, he was calling me, he called me twice - Marquito. But I was trying to call you. He was trying to get in touch with you. Uh, I don't know if you've talked to him, but he wanted to talk to you." MAURICIO responded "I will call him now. I know why he was calling you. The main accuser, main model accuser. 'That yes, them . . them . . .them!' He is no longer a part of this system. He's on the other side." ROBERTO SANCHEZ asked "What happened?" MAURICIO responded, "Think about it. They said that he's like Tito Rojas. He crashed in life so many times that it looks like he stayed at the stop. And that stop, you know . . . is a bit delicate over there. But, they put them to sleep ." ROBERTO SANCHEZ responded, "They put him to sleep?" MAURICIO responded "Correct. The main, model accuser. They're trying to find out why he accused so much, so fast. And, I don't know . . . it looks like they found something in his declaration that incriminated him." ROBERTO SANCHEZ responded, "You see, I told you M. There was something strange from the beginning. Because, how is it that they're going to put a red flag like that in the water if he's here? You understand? If its' here that they come and tell him, 'I want that, I want that, I want that one.' I knew there was something strange bro. But . . . shit! I'm sorry about that." MAURICIO responded "No, it's sad, it's very sad. Either way, that calls attention in many ways. So what we're going to do is, I 'll go over there and we'll focus on getting like-minded on the situation so that we can guarantee the thing. I will . . .[U/I]in one part[U/I] with them on a really good page, and . . . to multiply from many places. Because, you already know, after the embarrassment and the change of mind. But, no nothing . . . we

-5-

shouldn't think it's for sure." Later in the conversation, MAURICIO stated "Hey, listen, I want to see the fucking pedro, because, I don't know. I have a weird feeling. I want to look at his eyes. I don't know." ROBERTO SANCHEZ responded "Because, the asshole even sounds nervous on the phone. My wife told me." MAURICIO stated "Yes, I want to see him face to face. I need to see his eyes, I need to see his eyes. Because, there's simply no reason why . . . I have two hundred dollars for him. I'll say 'listen, this didn't happen, and if you one day can corroborate with me, I'll leave you a 'neutral' number. But, it's fine. Let's leave it alone because this isn't . . . you know? You understand." Based on my participation in this investigation and my review of other phone calls, I believe that when MAURICIO stated "The main accuser, main model accuser . . . Is no longer a part of this system. He's on the other side," he was referring to a murder carried out by narcotics traffickers of an individual suspected of being a law-enforcement informant. I believe that when MAURICIO stated, "Think about it. They said that he's like Tito Rojas," he was referring to the popular Puerto Rican salsa singer, and suggesting that other individuals in "Mauricio's" narcotics organization believed that the individual who was killed was "singing," i.e. he was providing information to law enforcement. I also believe that when ROBERTO SANCHEZ stated "how is it that they're going to put a red flag like that in the water," he was referring to his belief that the act of murdering the informant had the potential to bring law enforcement scrutiny to the TARGET SUBJECTS' narcotics operations at the port.

    c. On or about July 1, 2008, ROBERTO SANCHEZ placed an outgoing telephone call over the 7032 CELLPHONE to MILTON SAMUELS, a/k/a "Scooby," the defendant. During this call, SAMUELS stated "I'm in the house with nothing to do." ROBERTO SANCHEZ stated "I know, I know, I know. But, soon, pretty soon, pretty soon." SAMUELS stated "Okay, okay." ROBERTO SANCHEZ later stated "Look, is there any way that you get the 'insulin' or no?" SAMUELS responded, "Oh, you said "Avi" was picking them up this evening. He didn't get a chance yesterday, so I told him this evening. SO, pick it up and bring it over tomorrow morning." ROBERTO SANCHEZ stated "Okay, and let him know that, you know, I apologize for everything. But, next time we got to." SAMUELS stated "Yeah, I told him everything and he, he's cool. He said when you're ready, he's ready." Based on my training and experience, my participation in this investigation, and my review of other calls, I believe that when SAMUELS stated "I'm in the house with nothing to do," he was referring to the fact that he had not received any anticipated cocaine yet from ROBERTO SANCHEZ. I also believe that when ROBERTO SANCHEZ stated "I know, I know, I know. But, soon, pretty soon, pretty soon," he was referring to his belief that a shipment of cocaine would soon be

arriving. I believe that when ROBERTO SANCHEZ stated "Look, is there any way that you get the 'insulin' or no?," he was referring to the question of whether SAMUELS had any other narcotics to which he had access.

           d.  On or about July 11, 2008, ROBERTO SANCHEZ placed an outgoing telephone call over the 7032 CELLPHONE to LENROY MCLEAN, a/k/a "Dean," the defendant. During this call, MCLEAN stated "Everything okay Roby, I just need to talk to you man." ROBERTO SANCHEZ responded, "About who?" MCLEAN stated "Roby, man . . ." ROBERTO SANCHEZ asked "What happened . . . . you're alright?" MCLEAN stated "Yeah man, I just been . . . doing a lot of thinking lately man." MCLEAN then stated "You know Roby, me and you spoke before man. Because you don't remember the last time we sat outside your office. When you said that you don't even want to fuck with Scooby no more with the. . . and I'm like 'Yo, Roby, I need a break.' You know what I'm saying? Roby I need some play man." ROBERTO SANCHEZ stated "I don't understand, I don't understand." MCLEAN stated "To be honest Roby, me and Scooby, cool and all man, but it's like, I think I need to do shit on my own. And all the half stuff, man. Because I'm like, I feel like I'm been use man. And I'm not, having anything to show for nothing. You know what I'm saying Roby." ROBERTO SANCHEZ stated "Yeah." MCLEAN stated "I'm keeping it real Roby." ROBERTO SANCHEZ stated "Yo, but this guy is not working." MCLEAN stated "No, no. I know, I know, I know. I'm just asking you Roby, honestly man if you can give a start man. Whenever you, I don't want to know when you're doing what you all doing man. All I'm asking for is the start Roby man. You know what I mean? I been fucked up too long." ROBERTO SANCHEZ stated "I hear you, you know. But it is not cool that if I go around Scooby, you know." MCLEAN stated "You're not going around him. I'm keeping it real. Because if you, I wouldn't care if you even put it to him. You know what I'm saying? But Roby I feel like man, you know me for four years." ROBERTO SANCHEZ stated "You got to come by the office, you can't talk on the phone man." MCLEAN responded "Yeah, I know, I know." ROBERTO SANCHEZ stated "Well, we'll talk over there, alright?" MCLEAN responded "You want me coming there today?" ROBERTO SANCHEZ stated "If you want to. I rather do that than, the phone." Based on my training and experience, my participation in this investigation, and my review of other calls, I believe that when MCLEAN stated, "I'm like 'Yo, Roby, I need a break.' You know what I'm saying? Roby I need some play man," he was referring to his desire that ROBERTO SANCHEZ provide him with cocaine to distribute without going through SAMUELS. I also believe that when ROBERTO SANCHEZ stated "I hear you, you know. But it is not cool that if I go around Scooby, you know," he was referring to his belief that he should not conduct a drug transaction with MCLEAN without including SAMUELS. Finally, I

-7-

believe that when ROBERTO SANCHEZ stated "You got to come by the office, you can't talk on the phone man," he was referring to his unwillingness to discuss the details of a drug transaction over a telephone line.

        e. On or about July 1, 2008, ROBERTO SANCHEZ placed an outgoing telephone call over the 7032 CELLPHONE to MILTON SAMUELS, a/k/a "Scooby," the defendant. During this call, ROBERTO SANCHEZ stated "I spoke to M yesterday, and uh, he was supposed to see Pequeno and, and see me later but I haven't heard anything." Based on my training and experience, my participation in this investigation, and my review of other calls, I believe that when SANCHEZ stated "I spoke to M yesterday, and uh, he was supposed to see Pequeno and, and see me later but I haven't heard anything," he was referring to the fact that he had recently spoken with MAURICIO and that MAURCIO was supposed to be checking with EL PEQUENO about an impending shipment of cocaine.

    8. Only July 16, 2008, the DEA received judicial authorization to begin intercepting wire communications over a cellular phone used by MAURICIO ("the MAURICIO CELLPHONE"). The following are examples of some of the calls intercepted over the MAURICIO PHONE that relate to this narcotics conspiracy:

        a. On or about July 17, 2008, at approximately 7:17 p.m., MAURICIO placed an outgoing call over the MAURICIO CELLPHONE to an unknown individual who has been referred to as "El Pequeno" ("EL PEQUENO"), using a phone with IMSI 316010155663905. During this call, MAURICIO stated "The thing is that this area is fucked up buddy." EL PEQUENO responded, "Yes, but that area is just a jump away to the other area, that's not like deep, deep, you know." MAURICIO responded, "Yes. Everything is cool, then. Hey, this man, supposedly, they had to . . . there were five sticks and the loose one . . . . But anyway, that's up to them. I'm going to, I'm giving the five and the loose one of five. So from here, I'm getting ahead." El PEQUENO responded, "Yes, okay then. Based on my training and experience, my participation in this investigation, and my review of other phone calls, I believe that when MAURICIO stated "there were five sticks and the loose one" he was referring to a shipment containing five bundled packages of cocaine and one separate package of cocaine.

        b. On or about July 17, 2008, at approximately 8:52 p.m., MAURICIO received an incoming call over the MAURICIO CELLPHONE from to an unknown individual who is one of two individuals who has been referred to as "La Gorda" ("LA GORDA 2"), using a phone with assigned call number 347-724-9259. During

this call, LA GORDA 2 stated "This is La Gorda." MAURICIO responded, "Tell me." LA GORDA 2 stated, "We have to meet up right?" MAURICIO responded, "Ah... they have not told me anything yet." LA GORDA 2 stated, "Oh he said that I told you that 'that's' at 23. No. I told you that he had told me that they were going to give me 23, not at 23." MAURICIO responded, "No, no, no. Who said that?" LA GORDA 2 said "I don't know. They just asked me." MAURICIO stated, "They were going to give you 23?" LA GORDA 2 stated "No, no, no. He said that I said that I was going to get rid of each one at 23." MAURICIO responded "Oh!" Based on my training and experience, my participation in this investigation, and my review of other phone calls, I believe that when LA GORDA 2 stated "No, no, no. He said that I said that I was going to get rid of each one at 23" he was referring to a conversation with a third party in which it was concluded that LA GORDA would sell a quantity of cocaine for $23,000 a kilogram.

9. In late July, the DEA intercepted additional incriminating conversations over the 7032 CELLPHONE. The following are examples of some of the calls intercepted over the 7032 CELLPHONE during this time period that relate to this narcotics conspiracy:

a. On or about July 25, 2008, at approximately 1:18 p.m., ROBERTO SANCHEZ placed an outgoing call over the 7032 CELLPHONE to an unknown individual who has used the name "David" ("DAVID"). During this call, ROBERTO SANCHEZ stated "I think the lady is on vacation until Monday." DAVID responded "Oh. But anyway, that, that, container that is in the water doesn't get in until the 2nd." ROBERTO SANCHEZ responded "Until the 2nd, exactly. So, she . . ." DAVID stated "So we have time." ROBERTO SANCHEZ stated "When she returns, she'll call. Ok?" Later in the conversation, DAVID stated, "Anyway, the container is in the water." Based on my training and experience, my participation in this investigation, and my review of other phone calls, I believe that when ROBERTO SANCHEZ stated "I think the lady is on vacation until Monday," he was referring to his belief that a woman who could help the narcotics organization bring cocaine through the Port of New York/New Jersey was on vacation. I also believe that when DAVID stated that "Oh. But anyway, that, that, container that is in the water doesn't get in until the 2nd," he was referring to the fact that a ship carrying a cargo container filled with cocaine would not arrive in the New York area until August 2, 2008, at the earliest. Finally, I believe that when DAVID stated "So we have time," he was referring to his belief that the organization could wait for this woman to return from vacation because their shipment of cocaine would not arrive until after the conclusion of her vacation.

b.  On or about July 28, 2008, at approximately 2:19 p.m., ROBERTO SANCHEZ received an incoming call over the 7032 CELLPHONE from an individual who has used the name "Ernesto Rachitoff" ("ERNESTO"). During this call, ERNESTO stated "Good afternoon Roberto, How are you? Well, I was talking with David for a little bit and they told me that you had a problem?" ROBERTO SANCHEZ responded, "No, no. There was no, no problem. What happened was that I spoke with the Lady Angela Capola and she told me that she just came back from vacation since Thursday that she left and she was in a bad mood. But she kept talking with me and she told me that she doesn't have any inconvenience with the place that she was, and that's the place that was here, Yankee Clipper, that was here next to me – the one that went to New Brunswick. What she had was a problem with you because the merchandise that you were supposed to send her here, you sent it to Miami. That was the, what she told me." ERNESTO responded, "No, no, no let me explain it to you . . . . the container that I need help with, or that help is needed, is for Friday. The container that I think is getting there on Friday to New York. I already spoke to her in the morning, I explained to her." Later in the conversation, ERNESTO stated "It looks like she wants to use her normal people, just because of the fact that it is a shipment a little bit, a little bit hot and because she doesn't know us or our services, no." Based on my training and experience, my participation in this investigation, and my review of other phone calls, I believe that when ERNESTO said "they told me that you had a problem," he was referring to ROBERTO SANCHEZ's failure to secure a shipment of cocaine that had been sent to the port. I also believe that when ERNESTO said "the container that I need help with, or that help is needed, is for Friday," he was referring to a shipment of cocaine that would be arriving on a Friday in the future. Finally, I believe when ERNESTO said "it is a shipment a little bit, a little bit hot," he was referring to the fact that the shipment would contain a large amount of cocaine.

10.  During the course of this investigation, the DEA obtained judicial authorization to obtain location information from the service provider for "Mauricio's" cellphone. Through the use of this information, investigating agents have identified "Mauricio's" location during multiple conversations conducted in furtherance of the conspiracy as lower Manhattan.

11.  CW-1 has informed me that in or about the summer of 2007, he was present at ROBERTO SANCHEZ's office in South Kearney, New Jersey on an occasion when MILTON SAMUELS, a/k/a "Scooby," and LENROY MCLEAN, a/k/a "Dean," the defendants, came to meet with ROBERTO SANCHEZ and GABRIELLE COHEN-SANCHEZ. After

the initial meeting, SAMUELS and MCLEAN left the location. Approximately two hours later, MCLEAN returned to the building with a large duffel bag. CW-1 was present when MCLEAN opened the bag and presented it to ROBERTO SANCHEZ. The bag contained a vast amount of United States currency.

12. On or about October 22, 2008, at approximately 6:00 p.m., I and other agents conducted surveillance of MILTON SAMUELS, a/k/a "Scooby," and LENROY MCLEAN, a/k/a "Dean," as they drove in a Ford Pickup truck in the vicinity of 125th Street and Second Avenue in Manhattan, New York. Investigating agents conducted a traffic stop of the vehicle that SAMUELS and MCLEAN were driving and placed them under arrest. After informing SAMUELS and MCLEAN of their *Miranda* rights, investigating agents transported SAMUELS and MCLEAN to the DEA office in Newark, New Jersey. Both SAMUELS and MCLEAN agreed to participate in an interview. During the interview, both SAMUELS and MCLEAN acknowledged knowing ROBERTO SANCHEZ, but refused to provide any details about the nature of their relationship. MCLEAN also acknowledged that he participated in the call referenced in Paragraph 7 of this Complaint, and identified his voice. SAMUELS consented to a search of his residence in Queens, and signed a form consenting to the search.

13. On or about October 22, 2008, at approximately 9:00 p.m., investigating agents executed a search at SAMUELS' residence in Queens, pursuant to his consent. During the search, among other items, the investigating agents found a money counter, a heat sealer for plastic packaging, digital scales, a handgun, and an AK-47 assault rifle. SAMUELS later acknowledged that all of these items located in the house were his, including the guns.

WHEREFORE, deponent requests that MILTON SAMUELS, a/k/a "Scooby," and LENROY MCLEAN, a/k/a "Dean," the defendants, the defendants, be imprisoned or bailed, as the case may be.

*[signature]*
MIGUEL CARRERA
Special Agent
Drug Enforcement Administration

Sworn to before me this
23rd of October, 2008

*[signature]*
HONORABLE RONALD L. ELLIS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK